UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JONATHAN MICHAEL CLARCHICK,                Civil Action No. 12-12937


      Plaintiff,                                   HON. GERSHWIN A. DRAIN
                                                         U.S. District Judge
v.                                                       HON. R.  STEVEN WHALEN
                                                         U.S. Magistrate Judge
COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

Jonathan Michael Clarchick ("Plaintiff") brings this action under 42 U.S.C. §405(g),
challenging a final decision of Defendant Commissioner denying his applications for
Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the
Social Security Act.  Both parties have filed summary judgment motions which have been
referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the
reasons set forth below,  I recommend that Defendant's motion for summary judgment be
GRANTED and Plaintiff's motion DENIED.

## PROCEDURAL HISTORY

On May 5, 2008, Plaintiff filed  applications for SSI and DIB, alleging disability as
of August 15, 2008 (Tr. 162-176).  After the initial denial of the claim, he requested an

administrative hearing, held on January 11, 2011 in Detroit, Michigan before Administrative

Law Judge ("ALJ") Oksana Xenos (Tr. 39).   Plaintiff, represented by attorney Andrea

Hamm, testified (Tr.43-63), as did Vocational Expert ("VE") Erin O'Callaghan (Tr. 64-67).

On February 16, 2011, ALJ Xenos found that Plaintiff was not disabled (Tr. 30).   On May

12, 2012, the Appeals Council denied review (Tr. 1-4). Plaintiff filed for judicial review of

the Commissioner's decision on July 5, 2012.

## BACKGROUND FACTS

Plaintiff, born July 9, 1982, was 28 when the ALJ issued her decision (Tr.30, 162).

He graduated from high school (Tr. 218) and worked previously as a cook, customer service

representative, machinist, warehouse worker, and serviceman (Tr. 219).  His application for

benefits alleges disability as a result of Post Traumatic Stress Disorder ("PTSD"), Attention

Deficit Hyperactivity Disorder ("ADHD"), a bipolar disorder, psychotropic drug

dependency, and chest pains (Tr. 217).

### A.    Plaintiff's Testimony

Plaintiff offered the following testimony:

Plaintiff  stood 5' 10" and currently weighed 245 pounds.  He lived "on and off" with

his mother at her single family home in Wyandotte, Michigan and spent the rest of his time

living with a friend (Tr. 44).  He experienced disability as of August 15, 2008 due to

depression brought on by two tours of military duty in Iraq (Tr. 45).   After going absent

without leave ("AWOL") he was referred for mental health treatment by the military (Tr. 45).

He received a dishonorable discharge (Tr. 47).   Between his first and second tour of duty,

-2-

he became divorced from his wife (Tr. 46).  He still experienced depression (Tr. 45).

Plaintiff testified that he held "multiple" jobs since the alleged onset of disability but was terminated due to his inability to get along with his coworkers or supervisors (Tr. 47). His currently prescribed psychotropic medication did not improve symptoms of PTSD (Tr. 48).  He experienced a panic attack at a local mall two days prior to the hearing, but admitted that he did not require medical attention (Tr. 49).

On a typical day, Plaintiff would go to the gym for two hours, make himself breakfast, surf the web, perform household chores, eat, watch television, and visit with his girlfriend during the evening (Tr. 49-50).  Because of his problems in concentration, his mother often reminded him to finish his household chores (Tr. 50).  His internet use was limited to watching sports and movies (Tr. 50).  He was able to drive (Tr. 50).  He attended church (Tr. 50).  He had a child from his previous marriage but had not seen him in four years (Tr. 51). He disliked being around large groups (Tr. 51).  He did not smoke, drink, or use illicit drugs (Tr. 51-52).  Plaintiff reported that he had arthritis in his left knee and experienced migraines "four times a week" (Tr. 51).   Medicine prescribed for the migraines worked sporadically (Tr. 52).  He slept only two to three hours a night (Tr. 52).

In response to questioning by his attorney, Plaintiff stated that he was able to concentrate on a movie or television show for no more than half an hour before "losing interest" or becoming distracted by household activity (Tr. 53-54).  He experienced nightmares (Tr. 54).  He reiterated that his mother assigned him household chores but that he needed reminders to complete his work (Tr. 55).  His mother was "always on [his] case"

(Tr. 56).  The previous autumn, he had become distracted by a neighbor's dog that had run across the street while he was power washing the outside of his mother's house, leading him to abandon the power washing in mid-task (Tr. 57).  On a scale of one to ten, his migraines created level "seven to eight" pain (Tr. 57).  He coped with migraines by lying in a darkened room with cold towels on his head for anywhere between half an hour and six hours (Tr. 57-58).  As a result of the left knee arthritis, he experienced problems using stairs (Tr. 58).  He described himself as socially isolated, noting that he interacted mostly with his girlfriend, mother, and younger brother (Tr. 59).  He experienced anger and distrust toward people in general (Tr. 59).  His psychotropic medication caused drowsiness, nightmares, and sexual side effects (Tr. 60).

Plaintiff alleged that he could sit for unlimited periods provided he was in a position where he could move his left leg comfortably (Tr. 61).  He was unable to stand for longer than 10 minutes, walk for more than half a mile, or lift more than 20 pounds (Tr 61-62).  Plaintiff offered several reasons for failing to keep a job, including becoming distracted by customers, "going on the computer" when he was supposed to be stocking shelves, and the weight of the boxes he was required to lift (Tr. 63).  Plaintiff stated that he "like[d] to do things to [his] own schedule, not the way other people [told him] to do it" (Tr. 63).

### B.   Medical Evidence[1]

### 1. Treating Sources

---

[1]Medical records predating the alleged onset date of August 15, 2008 are included for background purposes only.

September, 2006, Darnell Army Hospital records show that Plaintiff was treated for back pain (Tr. 275).  He denied depression (Tr. 275).  He was prescribed Tramadol and advised to perform core strengthening exercises (Tr. 276).  April, 2008 notes state that he currently smoked a half pack of cigarettes each day (Tr. 277).

In May, 2009, Plaintiff sought treatment for right ankle and knee injuries sustained in a fight with police (Tr. 290).  Symptoms created by the injuries were deemed "mild" (Tr. 290).  Plaintiff appeared alert and fully oriented (Tr. 291).  He was advised to relieve the swelling with ice, elevation, over-the-counter pain relievers and Ultram (Tr. 292, 297).  Imaging studies of the right knee were negative for fractures (Tr. 296).

Plaintiff sought emergency treatment for chest pain and breathing difficulties in October, 2009 (Tr. 300).  He denied a history of anxiety, bipolar disorder, or depression (Tr. 301).  He demonstrated an appropriate effect (Tr. 303).  Imaging studies of the chest were unremarkable (Tr. 306).  Plaintiff admitted to smoking one quarter of a pack of cigarettes each day (Tr. 301).  He was released after his condition showed improvement (Tr. 302).

January, 2010 medical reports from the Wayne County Jail state that Plaintiff was arrested for malicious destruction of police property (Tr. 312).  Plaintiff reported that he was currently taking Seroquel for psychological symptoms (Tr. 312).  He appeared cooperative with relevant and coherent but disorganized speech (Tr. 313).  He was assigned a GAF of 60

with polysubstance abuse problems[2] (Tr. 313). Plaintiff reported GERD and "chronic" headaches (Tr. 315). He was diagnosed with PTSD, polysubstance abuse, and ADHD (Tr. 316). He was prescribed Prozac and Sinequan (Tr. 316).

Notes from an October, 2010 mental intake exam by Kathleen M. Regan, M.D. state that Plaintiff was traumatized by the injury and death of fellow soldiers in Iraq (Tr. 347). He reported anxiety and irritability (Tr. 347). He stated that he had been fired from three different jobs for arguing, fighting, and threatening others (Tr. 348). He denied current illicit drug use (Tr. 348). Regan assigned him a GAF of 30[3] (Tr. 348). She prescribed Prozac (Tr. 349). Plaintiff demonstrated an appropriate affect, thought process, and thought content (Tr. 358). Treating notes from the following month state a GAF of 51 to 60 (Tr. 360).

November, 2010 medical treating notes by Lynn M. Murphy, D.O. state that Plaintiff was "headache free" after using Maxalt (Tr. 389). Dr. Murphy remarked that all objective tests on the left knee were negative for abnormalities (Tr. 389). The same month, Dr. Murphy completed a medical examination report for a state agency, finding that Plaintiff experienced headaches, left knee pain, GERD, and PTSD (Tr. 402). In December, 2010,

---

[2]

A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV-TR*"), 34 (4th ed.2000). GAF scores in the range of 61-70 indicate "some mild [psychological] symptoms or some difficulty in social, occupational, or school functioning." *Id.* at 32.

[3]A GAF score in the range of 21-30 is associated with "considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment OR inability to function in almost all areas." *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV-TR*"), 34 (4th ed.2000).

Regan completed a Mental Residual Functional Capacity Assessment, finding that Plaintiff experienced marked limitations in concentration, social interaction, and adaptation (Tr. 367). Treating notes from the same period state that Plaintiff's level of motivation for acquiring new skills was "high" (Tr. 369).

## 2.   Non-Treating Sources

In June, 2010, R. Hasan, M.D. performed a psychiatric examination of Plaintiff on behalf of the SSA (Tr. 321-326).  Plaintiff reported that he received psychiatric treatment as a teenager due to fighting in school and problems with authority (Tr. 321).  He admitted that he had been to jail five times (Tr. 322).  He denied current psychiatric treatment (Tr. 322). Plaintiff reported hearing voices (Tr. 322).  He also alleged memory problems (Tr. 322). Dr. Hasan found that Plaintiff had contact with reality, but low self esteem and no motivation (Tr. 323).  He noted that Plaintiff experienced ongoing mood swings, and problems with authority and difficulty concentrating (Tr. 324).  He assigned Plaintiff a GAF of 59 with a "fair to guarded" prognosis (Tr. 324).

The same month, David A. Harley, Ph.D. performed a non-examining Psychiatric Review Technique based on the treating records, finding the presence of ADHD, depression, and cannabis and alcohol abuse (Tr. 327, 328, 330, 335).  Under the "'B' Criteria," Dr. Harley found moderate limitation in activities of daily living, social functioning, and concentration, persistence, or pace (Tr. 337).  He found no episodes of extended decompensation (Tr. 337).

Reviewing the treating and consultative records, Dr. Harley found that

notwithstanding Plaintiff's diagnoses, he could "understand, remember, and carry out simple instructions; make judgments . . . commensurate with the functions of unskilled tasks, i.e., work-related decisions; respond appropriately to supervision, coworkers and work situations; and deal with most changes in a routine work setting" (Tr. 339).  Dr. Harley also completed a Mental Residual Functional Capacity Assessment, finding that Plaintiff had moderate limitations in understanding, remembering, and carrying out detailed instructions; maintaining concentration for extended periods, sustain an ordinary work routine without supervision; working in coordination with others; interacting appropriately with the general public, supervisors, and coworkers; and the ability to set realistic goals (Tr. 341-342).  Dr. Harley completed the Assessment by reiterating that Plaintiff was capable of performing unskilled work in an isolated and low-stress setting (Tr. 343).

### C.        Vocational Expert Testimony

The ALJ posed the following question to VE O'Callaghan, taking into account Plaintiff's age, education and work experience:

> [A]n individual . . . who can perform work at all exertional levels, but is limited to simple, unskilled, routine, low-stress, self-paced, non-production-oriented work, with minimal changes in the work routine; minimal contact with the general public and coworkers; and should avoid hazards such as moving machinery and unprotected heights.  Can an individual with that residual functional capacity and given profile perform any of his past relevant work (Tr.  65).

The VE replied that given the above limitations, the individual would be unable to

perform any of Plaintiff's past relevant work but could perform the work of a machine operator as well as the exertionally light jobs of small products assembler (6,000 positions in the regional economy); and inspector (12,000)[4] (Tr. 65).  The VE stated that the inclusion of a sit/stand option would reduce the job numbers for the small assembly and inspector positions by 10 percent (Tr. 66).  The VE testified that if the same individual were "off task" for up to 20 percent of the workday due to "mood swings, anxiety, and a combination of other impairments," he would be unable to perform any work (Tr. 66).  The VE stated that her information was consistent with the information found in the *Dictionary of Occupational Titles* ("DOT") but that the DOT did not account for her testimony regarding the sit/stand option, noting that her testimony pertaining to the sit/stand option was based on her professional experience (Tr. 66).  In response to questioning by Plaintiff's attorney, the VE testified that "typical" absenteeism would consist of one to two days each month but no more than 15 in a year (Tr. 67).

### D.  The ALJ's Decision

Citing Plaintiff's medical records, the ALJ found that Plaintiff experienced the

---

[4]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

4:12-cv-12937-GAD-RSW   Doc # 18   Filed 07/23/13   Pg 10 of 18   Pg ID 494

"severe" impairments of "[PTSD], bipolar disorder, a history of polysubstance abuse, knee arthritis, and a history of headaches" but that none of the conditions met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 14). The ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") for light work with the following limitations:

> [S]imple, unskilled, routine, low-stress, self-paced, non-production-oriented work with minimal changes in work routine and minimal contact with the general public and coworkers; he should avoid hazards, such as moving machinery and unprotected heights; and he requires a sit/stand option (Tr. 24).

Citing the VE's job numbers, the ALJ determined that while Plaintiff was unable to perform any of his past relevant work, he could work as a small products assembler and inspector (Tr. 29).

The ALJ discounted Plaintiff's allegations of disability (Tr. 25-28). She noted that despite Plaintiff's claims that he was unable to follow instructions or stay on task, he followed "a very structured routine" (Tr. 28). The ALJ found that Plaintiff's claim that he could not stand for more than five minutes due to knee problems was undermined by his ability to work out at a gym for two hours every day (Tr. 28). She observed that Plaintiff's alleged concentrational and social problems did not prevent him from preparing complete meals, performing household chores, shopping, handling a savings account, and interacting with his brother and girlfriend (Tr. 28).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine

-10-

whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe

impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### The Vocational Testimony[5]

Plaintiff contends that his psychological impairments prevent him performing any

---

[5]

Plaintiff bases his arguments for remand exclusively on his alleged mental/psychological/concentrational limitations.  Any other issue not raised directly by Plaintiff is deemed waived. *United States v. Campbell,* 279 F.3d 392, 401 (6th Cir.2002). Likewise issues raised "'in a perfunctory manner, unaccompanied by some effort at developed argument'" are deemed waived."  *Clemente v. Vaslo,* 679 F.3d 482, 497 (6th Cir. 2012)(citing *Langley v. DaimlerChrysler Corp.,* 502 F.3d 475, 483 (6th Cir.2007)).

work. *Plaintiff's Brief* at 6-10, *Docket #12* (citing SSR 85-15).   He argues that given his

significant psychological problems, the VE's failure to provide DOT job codes along with

testimony that the hypothetical individual could work as a small products assembler or

inspector amounted to reversible error. *Id.* at 7-9 (citing Tr. 65). He also contends that the

ALJ erred by failing to mention of his deficiencies in concentration in the hypothetical

question. *Id.* at 9-10 (citing Tr. 65).

### A.  The VE's Job Testimony

Plaintiff's argument that the failure to provide DOT job codes constitutes reversible

error is not well taken.  SSR 00–4p "imposes an affirmative duty on ALJs to ask VEs if the

evidence that they have provided 'conflicts with the information provided in the DOT.'"

*Lindsley v. Commissioner of Social Sec.,* 560 F.3d 601, 606 (6th Cir.2009)(citing SSR 00–4p,

2000 WL 1898704, *4).   Here, the ALJ complied with the requirements of the Regulation

by asking the VE if her testimony was consistent with the information found in the DOT (Tr.

66).   The VE answered in the affirmative (Tr. 66).  Having made the required inquiry and

taken testimony that the job findings were not inconsistent with the information found in the

DOT, the ALJ was not obliged to do more.  "'Nothing in SSR 00–4p places an affirmative

duty on the ALJ to conduct an independent investigation into the testimony of witnesses to

determine if they are correct.'" *Lindsley* at 606 (citing *Martin v. Comm'r of Soc. Sec.,* 170

Fed.Appx. 369, 374 (6th Cir. March 1, 2006)).  Plaintiff's related argument that the ALJ

erred by failing to resolve alleged conflicts between the VE's testimony and the DOT as

required by SSR 85-15 is thus inapplicable.[6]

Further, while Plaintiff faults the ALJ for declining the VE's offer to provide DOT job codes, "[t]he absence of specific DOT code numbers does not undermine the substantial evidence supporting the ALJ's decision." *Patterson v. Commissioner of Social Sec.,* 2010 WL 774678, at *3 (W.D.Mich. March 1, 2010); *Pefley v. Astrue* 2010 WL 1002613, at *11 (E.D.Mich.March 17, 2010)(Borman, J.)(the ALJ need not elicit DOT job codes from the VE to comply with SSR 00–4p). Plaintiff also contends that the job description for DOT job code 706.684-022 (Assembler, small products (any industry)) does not account for his need for non-production work or need to work independently as stated in the RFC. *Plaintiff's Brief* at 8. However, the fact that Plaintiff, as described by the RFC, may be capable of only a reduced range of small assembler positions is not fatal to the Step Five findings. "The ALJ may choose to rely on the VE's testimony in complex cases, given the VE's ability to tailor h[is] finding to an 'individual's particular residual functional capacity.' The function of the VE is to advise the ALJ of jobs found among various categories of employment which the claimant can perform with h[is] limitations." *Beinlich v. Commissioner,* No. 08–4500, 2009 WL 2877930, at *4 (6th Cir.Sept.9, 2009) (*citing Wright v. Massanari,* 321 F.3d 611, 616 (6th Cir.2003)). Likewise, I am unaware of any regulation or case law supporting Plaintiff's argument that the VE was  required divide her "inspector" job finding into subcategories of

---

[6]The VE's testimony that her findings regarding the sit/stand option was based on her professional experience, rather than the DOT, does not represent a "conflict," given that the DOT is silent as to the need for a sit/stand option (Tr. 66).

inspector positions.

Further, despite counsel's present criticism of the ALJ for declining the VE's offer to provide the job codes, Plaintiff's attorney at the administrative hearing did not request the job codes for the VE's job findings.  Counsel's failure to cross-examine the VE or request the job codes undermines the present argument that conflicts existed between the VE's testimony and the DOT.  *Lindsley,* 560 F.3d at 606.  Because the ALJ fulfilled the requirements of SSR 00-4p in asking whether the vocational testimony conflicted with the DOT, a remand on this basis is not warranted.

### B.  Plaintiff's Moderate Deficiencies in Concentration, Persistence, or Pace

Plaintiff also argues that the hypothetical question did not address his "lack of prolonged concentration," despite the ALJ's finding that he experienced moderate deficiencies in concentration, persistence, and pace ("CPP"). *Plaintiff's Brief* at 9-10 (citing Tr. 24, 64-65).  Citing *Edwards v. Barnhart,* 383 F. Supp. 2d 920, 930 (E.D. Mich. 2005)(Friedman, J.)*,* he contends that the failure to include his deficiencies in concentration in the hypothetical question invalidates the VE's job findings.  *Id.*

 Plaintiff is correct that a hypothetical question constitutes substantial evidence only if it accounts for the claimant's full degree of work-related impairment.  *Varley v. Secretary of HHS,* 820 F. 2d 777, 779 (6th Cir. 1987).  However, while "[t]he hypothetical question ... should include an accurate portrayal of [a claimant's] individual physical and mental impairments," it need not list all of a claimant's maladies verbatim.  *Webb v. Commissioner of Social Sec.*, 368 F.3d 629, 632 (6th Cir.2004)(citing *Varley,*  820 F.2d at 779 (6th Cir.

1987)); *see also Smith v. Halter*, 307 F.3d 377, 379 (6th Cir.2001).

Moderate deficiencies in CPP suggest substantial limitations which must be acknowledged in the hypothetical question. *Edwards, supra,* 383 F.Supp.2d at 931. The failure to adequately account for moderate deficiencies in concentration, persistence and pace in the hypothetical question may constitute reversible error. "Simple, routine, and unskilled," even used in conjunction, may be insufficient to account for moderate deficiencies in CPP. *Id.*; *See also Ealy v. Commissioner,* 594 F.3d 504 (6th Cir. 2010). However, the ALJ is not required to include verbatim the phrase "moderate deficiencies in concentration, persistence, or pace" or other talismanic language in the hypothetical question. *Smith,* 307 F.3d at 379; *Webb,* 368 F.3d at 633.

Here, the ALJ's choice of hypothetical limitations sufficiently addressed Plaintiff's moderate deficiencies in CPP. In addition to the qualifiers of "simple, unskilled, routine" work (as found in *Edwards*) the present hypothetical/RFC limited Plaintiff to "low-stress, self-paced, non-production-oriented work, with minimal changes in the work routine" and the avoidance of hazards such as moving machinery and heights (Tr. 64-65). Although the hypothetical did not state *per se* that Plaintiff experienced moderate concentrational deficiencies, the ALJ's choice of qualifiers, read in tandem, sufficiently addresses deficiencies in concentration found in the record. *Smith, supra,* 307 F.3d at 379.[7]    The

---

[7]

A number of courts in this district have found the terms simple, routine, and unskilled, without more, are sufficient to account for the claimant's moderate concentrational limitations. *See Lewicki v. Commissioner of Social Security*, 2010 WL 3905375, *2 (E.D.

record as a whole does not support the need for more stringent hypothetical limitations. By Plaintiff's own account, deficiencies in CPP did not prevent him from working out at a gym for two hours each morning, making simple meals, performing internet searches, attending church, following a movie or television plot for at least half an hour, or visiting with his girlfriend daily (Tr. 49-50, 53-54). His generalized argument, pursuant to SSR 85-15, that he lacks the mental capacity for all gainful employment is also defeated by his ability to engage in a wide variety of activities.

My recommendation to uphold the Commissioner's decision should not be read to trivialize Plaintiff's psychological limitations or the import of his military service, and were this *de novo* review, my conclusions might well be different. Nonetheless, because the ALJ's decision was well articulated and within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's motion for summary judgment be GRANTED and Plaintiff's motion DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of

---

Mich. Sept. 30, 2010)(the modifiers of "simple routine work" adequately account for moderate deficiencies in CPP); *Schalk v. Commissioner of Social Sec.*, 2011 WL 4406824, *11 (E.D.Mich. August 30, 2011)("no bright-line rule" that moderate concentrational deficiencies require the inclusion of certain hypothetical limitations)(citing *Hess v. Comm'r of Soc. Sec.*, No. 07–13138, 2008 WL 2478325, *7 (E.D.Mich. June 16, 2008))(same).

service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: July 23, 2013                        s/ R. Steven Whalen_____
                                            R. STEVEN WHALEN
                                            UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the foregoing document was sent to parties of record on July 24, 2013, electronically and/or by U.S. mail.

                                            s/Michael Williams_____
                                            Case Manager for the
                                            Honorable R. Steven Whalen

-18-